## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

### Introduction and Background

1. Based on the information set forth below, I am seeking four search warrants for: **1529 Park Street, Muskegon, Michigan; 379 East Dale Avenue, Muskegon Michigan**; a **2008 Dodge Caravan** with Michigan registration EFN5821 (the **"Subject Vehicle"**); and an **Apple iPad**. Based on the information below, there is probable cause to believe that evidence of violations of federal law, specifically, 18 U.S.C. § 924 (c), using a firearm in furtherance of a federal crime of violence, and 18 U.S.C. § 111, assaulting a federal officer, will be found in the locations listed in the respective Attachments A to each search warrant application. The categories of items to be seized are described more fully in the respective Attachments B to each search warrant application.

2. I have been a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since 2007, and am currently assigned to the Grand Rapids, Michigan Field Office. My responsibilities include the investigation of criminal violations of Titles 18 and 21 of the United States Code, with emphasis on illegal firearms trafficking, use, and possession.

3. The information set forth in this affidavit is based upon my personal knowledge derived from my participation in this investigation and on information from other federal, local, and state law enforcement agencies. Specifically, the statements set forth in this affidavit include information learned from, but not necessarily limited to, the following sources: (a) other law enforcement agencies; (b) subject interviews; and (c) my training and experience in addition to the training and experience of other law enforcement agents.

4.      Because this warrant application is being submitted for the limited purpose of establishing probable cause to search, I have not set forth every fact learned during the course of this investigation.

### Probable Cause

5.      On August 4, 2021, Special Agent (SA) Geoffrey Yandl of the ATF Grand Rapids Field Office was working as part of the Muskegon Major Crimes Initiative in Muskegon, Michigan, in the Western District of Michigan.  SA Yandl was conducting surveillance with detectives from the Michigan State Police and the Muskegon City Police Department.

6.      While conducting surveillance on Park Street near Southern Avenue, Muskegon City Police Detective Kyle Hall observed three black male subjects at **1529 Park Street** acting suspiciously.  The subjects were standing next to the open doors of a light color **Dodge Caravan** ("the **Subject Vehicle**") that was backed into the driveway.  The subjects were intently staring at Detective Hall as he drove passed.  The subject standing next to the open passenger door appeared to take cover as he reached into the **Subject Vehicle**, as if he were quickly and offensively reacting to a threat.  Detective Hall circled the block and subsequently saw the **Subject Vehicle** leaving the driveway with all three subjects inside.

7.      The **Subject Vehicle** was identified through visual surveillance as a light color 2008 Dodge Caravan bearing Michigan registration plate EFN5821.  It is registered to Julia and Edith Weaver at **1529 Park Street**.

8.      The **Subject Vehicle** drove from **1529 Park Street** to the Frontier Mart convenience store at 631 West Southern Avenue.  Two black males from the **Subject Vehicle** entered the Frontier Mart separately, then exited and returned to the vehicle.  The **Subject Vehicle** then drove east on Southern Avenue.  The **Subject Vehicle** parked on 7th Street just north of

Southern Avenue.  An occupant in all dark clothing exited the **Subject Vehicle** and approached a residence.  Minutes later, the **Subject Vehicle** drove away south on 7th Street.

9. Surveillance officers followed the **Subject Vehicle** for several blocks until it stopped on Catherine Avenue near Pine Street.  A black male exited the rear sliding door of the **Subject Vehicle** and walked away.  The person was clutching something with both hands against the front of his waist.  The **Subject Vehicle** then drove away, and SA Yandl followed it in his government vehicle on Catherine Avenue near Spring Street in a residential neighborhood.

10. SA Yandl and the **Subject Vehicle** were the only two vehicles moving on Catherine Avenue. SA Yandl was approximately 80 to 100 yards behind the **Subject Vehicle** in his government vehicle when he heard four gunshots.  The **Subject Vehicle** then drove at a high rate of speed east on Catherine Avenue.  SA Yandl followed the **Subject Vehicle** as it turned north and then east onto Isabella Avenue, in another residential neighborhood.

11. SA Yandl followed the **Subject Vehicle** as it slowed down and came within 40 to 50 yards of it on Isabella Avenue near Getty Street.  SA Yandl observed a black male occupant of the **Subject Vehicle** lean out the front passenger window facing backward, toward SA Yandl.  The subject pointed a gun at SA Yandl and fired several gunshots.  SA Yandl heard two bullets strike his government vehicle.  The **Subject Vehicle** then drove at a high rate of speed east on Isabella Avenue.  SA Yandl continued to follow the **Subject Vehicle** as other officers moved toward the area.  The **Subject Vehicle** turned north on Madison Street and SA Yandl lost sight of the vehicle.

12. SA Yandl turned around on Madison Street and drove down Ada Avenue.  SA Yandl immediately observed the **Subject Vehicle** parked on the north side of the 1000 block of Ada Avenue, in a residential neighborhood.  The **Subject Vehicle** had smoke coming from under the hood and three black males were standing next to it.

13. SA Yandl activated the police lights and siren on his government vehicle. Two of the three black males fled on foot north between houses. One black male crouched behind a small white fence in front of 1038 Ada Avenue. The subject reached over the fence with a gun pointed at SA Yandl and fired two gunshots. The subject then fled on foot north between the houses.

14. SA Yandl and responding officers set up a perimeter and contacted a K9 officer to conduct a track and search. The K9 track was lost at Apple Avenue.

15. The search resulted in officers locating evidence, including the following:

   a. an **Apple iPad** and two .45 caliber spent ammunition casings on the ground next to the white fence near where one subject was shooting. The **Apple iPad** was turned on and actively rang several times during the incident. In this way, the **iPad** appeared to have functionality similar to a mobile device or cellular telephone. The **Apple iPad** and casings were collected by the Muskegon Police Department and stored as evidence.

   b. the **Subject Vehicle** with Michigan registration EFN5821 was seized and impounded as evidence.

   c. a loaded .38 caliber revolver handgun was located behind 1042 Ada Avenue, near where one subject fled on foot.

   d. six .45 caliber ammunition casings were located on Isabella Avenue near Getty Street.

   e. four .380 caliber ammunition casings were located on Catherine Avenue near Spring Street.

16. Based on the evidence recovered, I have determined that at least three firearms were present at the scene: a .45 caliber pistol (from the spent ammunition casings on Isabela and Ada Avenues), a .380 pistol (from the spent ammunition casings on Catherine Avenue), and the .38 caliber revolver (found behind a residence on Ada Avenue). Only the .38 caliber revolver has been recovered.

17. Investigators obtained surveillance footage from the Frontier Mart. Detective Hall conducted a review of the video footage.

a. Detective Hall saw that the passenger of the van first entered the store. The passenger is observed on camera walking in, turning around and walking out. The passenger returned to the front passenger seat. About 10 to 15 minutes later was when someone from the front passenger seat leaned out and shot at SA Yandl; although the occupants of the van could have moved about during this incident, as outlined below, the last person law enforcement saw in the front passenger seat before the shots were fired was Errion PATTERSON.

b. The photograph below is a still photograph of the passenger taken from the Frontier Mart surveillance footage:



    c.   The passenger was identified from known law enforcement photographs as Errion PATTERSON. The photograph below is photograph of PATTERSON taken from a law enforcement database:



        i.   According to law enforcement databases, PATTERSON resides at **379 East Dale Avenue, Muskegon Michigan**.

    d.   The driver then exited the vehicle and entered the store. The driver can be identified from known photos as Kentrell ROBERSON. ROBERSON's listed address in law enforcement databases is **1529 Park Street.**

        i.   The photograph below is a still photograph of the driver taken from the Frontier Mart surveillance footage:



ii. The photograph below is photograph of ROBERSON taken from a law enforcement database:



18. ROBERSON and PATTERSON are known associates. Specifically, on July 8, 2021, Muskegon Police conducted a traffic stop on a silver Buick Century for a traffic violation. The driver was Errion PATTERSON. The passenger was Kentrell ROBERSON. ROBERSON fled on foot and was later apprehended. The vehicle was impounded and was searched pursuant to an inventory search. A loaded handgun was located in the center console.

19. With respect to the **Apple iPad** and **Subject Vehicle** the United States Attorney's Office has informed me that we may have other independent bases outside of a search warrant to search these items; however, out of an abundance of caution, I am seeking warrants for those items.

20. Based on my training and experience, my participation in numerous firearm investigations and investigations relating to firearms violations, and based upon discussions with other law enforcement officers, I know:

   a. Firearm owners keep their firearms in their residence and vehicles.

   b. Firearm owners often secure their firearms in safes or locked containers.

   c. Illegal firearm owners may hide their firearms in attempt to avoid location by law enforcement (such as: false walls, hidden compartments, attics, storage lockers, crawl spaces, or other secret locations).

   d. Illegal firearm users commonly conduct financial transactions in cash to avoid documentation of their purchases and expenditures, thus making it more difficult for law enforcement to identify these transactions.

   e. Individuals who possess firearms also possess other items associated with their firearms including ammunition, magazines, holsters, and cases; and records indicating purchase, use, maintenance, or sale of such items.

21.     Furthermore, based on my training and experience, participation in numerous firearm investigations and financial investigations relating to illegal firearms, and based upon discussions with other law enforcement officers, I know:

  a. Illegal firearms users and traffickers use mobile devices to facilitate the purchase and sale of illegal firearms. Mobile devices are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so firearms traffickers use the devices in an effort to avoid detection by law enforcement. Mobile devices often contain evidence indicative of illegal firearms possession and trafficking, including records of incoming and outgoing calls and text messages with suppliers and purchasers of firearms; voicemail messages; photographs of firearms, coconspirators, or currency; customer and supplier contact information; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high crime areas or evidencing the route used in trafficking illegal firearms. Additionally, illegal firearms traffickers typically maintain and use multiple mobile devices, often in the names of nominees, to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are used to access social media websites such as Facebook, Instagram, etc. In my training and experience, I know that illegal firearms possessors use social media assessed via mobile devices with increasing frequency to communicate with suppliers and purchasers.

    b. It is common for illegal firearms possessors to take and maintain photographs of themselves and their colleagues with firearms and cash displayed as the tools and proceeds of their illegal activity, and to keep either physical or electronic copies of those images. The images are often stored on smart phones, computers, and other digital devices, as well as on social media websites such as Facebook, Instagram, etc., and accessed via mobile devices. Digital evidence can be found for a long period of time on computers, cell phones, and other mobile devices because a forensic examiner can access even temporary and deleted files, as well as internet history, long after they are accessed or created by the user.

## Conclusion

22.    Wherefore, by this continuation and application, I respectfully request that the Court issue search warrants that would allow agents to search for and seize evidence from **1529 Park Street, Muskegon, Michigan; 379 East Dale Avenue, Muskegon Michigan;** the **2008 Dodge Caravan** with Michigan registration EFN5821 (the **"Subject Vehicle"**); and the **Apple iPad** recovered from the area of the shooting. The items and information sought to be searched and seized are more specifically described in the respective Attachments B to the warrant applications. For the foregoing reasons, I have reason to believe that firearms, ammunition, and other evidence of violations of 18 U.S.C. §§ 924(c) and 111 will be found at these locations and respectfully request the Court issue the warrants.